

# NUMBER 13-24-00486-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF K.H., A CHILD

## ON APPEAL FROM THE 329TH JUDICIAL DISTRICT
## OF WHARTON COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Silva, Peña, and Cron**
**Memorandum Opinion by Justice Silva**

Mother C.S. appeals from the trial court's order terminating the parent-child relationship between her and her son, K.H.[1] By what we construe as two issues, C.S. challenges the legal and factual sufficiency of the evidence to support: (1) the

---

[1] We refer to the parties and child by initials in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

enumerated grounds for termination; and (2) a finding that termination was in the best interest of the child. *See* TEX. FAM. CODE. ANN. §§ 161.001(b)(1)(D), (E), (N), (O), 161.001(b)(2). We affirm.

## I. BACKGROUND

The Texas Department of Family and Protective Services (Department) received an intake report on January 6, 2023, indicating that C.S. and K.H. had been "Life Flighted" to the Houston area from El Campo, Texas. According to the Department, there were allegations that C.S. and K.H. both tested positive for amphetamines when K.H. was born on January 5, 2023. During her hospital stay, C.S. did not cooperate with the Department's investigation, and C.S. and K.H. went missing shortly thereafter which prevented the Department from offering family services. The Department attempted to reach out to family members and friends without success. The investigation was ruled "Reason to Believe" and the Department placed K.H. on the Child Safety Check Alert List (CSCAL).[2]

On September 21, 2023, the Department received a second intake report alleging that C.S. was seen walking across State Highway 59 in Louise, Texas, with then eight-month-old K.H. in her arms. After unsuccessful efforts by law enforcement to ensure K.H.'s safety, C.S. was arrested for child endangerment. The Department alleged that after being taken into custody, C.S. provided law enforcement the contact information of a family member that could pick up and care for K.H. However, the family member reportedly refused and stated that she did not know C.S. very well, could not

---

[2] The Child Safety Check Alert List is a law enforcement database that was created to assist the Department in locating a family for the purpose of investigating a report of child abuse or neglect. *See* TEX. FAM. CODE ANN. § 261.3022.

2

help with the child, and did not know anyone else who could. The Department attempted to contact several other family members and potential placements for K.H., but did not have success. K.H.'s father, M.H., was incarcerated during that time.[3] The Department ultimately removed K.H. on September 22, 2023.

On October 18, 2023, the trial court conducted an adversary hearing and named the Department temporary managing conservator of K.H. Among other things, the trial court found that "parental possession or access would endanger the physical or emotional welfare of the child, and that it is in the best interest of the child to limit the rights, duties and possession, and access of [C.S.]" The trial court ordered that C.S. "shall have limited access to and possession of the child as set forth in [the Department's temporary supervised visitation schedule]." On November 29, 2023, the trial court held a status hearing and adopted the Department's family plan of service as an order of the court. *See id.* §§ 263.102, 263.202(b-1). Relevant here, C.S.'s family plan of service required her to: obtain and maintain safe and stable housing; complete parenting classes; complete a drug and substance abuse assessment and follow the recommendations of the provider; submit to random drug testing upon request; complete a psychological evaluation and follow all recommendations; and attend supervised visits with K.H. as scheduled. The plan of service notified C.S. that any refused or missed drug test would be considered as a positive result.

On September 6, 2024, the case proceeded to a bench trial and the following evidence was adduced. Wharton County Sheriff's Office Deputy Joe Leivas testified that he received three separate reports from dispatch after midnight on September 21, 2023,

---

[3] The trial court's judgment also involuntarily terminated the parental rights of K.H.'s father, M.H., who is not a party to this appeal.

3

about a white female with an infant walking on State Highway 59 traveling northbound on the southbound lane amidst heavy traffic and wearing dark clothing. A witness "advised that she tried to make contact with the female . . . to see if she needed assistance," but the woman "ran away." After arriving at the scene, Deputy Leivas discovered C.S. and K.H. outside of a truck stop near State Highway 59 that was closed for business. He observed C.S. to be "wearing all black" clothing which matched the description provided by the witnesses. He also observed K.H. to be "dirty," wearing only "a T-shirt and a diaper." Deputy Leivas testified that C.S. was "only carrying a cell phone and a pack of cigarettes" and that "[t]here was no . . . baby bag, no formula, no change of clothes, no change of diapers or anything . . . that could indicate that the [c]hild was being well taken care of at the time."

Deputy Leivas further testified that C.S. appeared to be "coherent," but "her facial expressions were indicating that she probably had been going without . . . sleep." He asked C.S. when K.H. had his last feeding and she replied "around 10:00 o'clock" and that she feeds K.H. "every four hours." According to Deputy Leivas, K.H. did not have "visible injuries" or appear in "distress," however he agreed that he was "concerned for the safety of the [c]hild." He also observed K.H. "continuously suck[ing] on his fingers as if he w[ere] trying to determine that he was hungry." He stated that when he inquired where C.S. was headed, "[s]he really couldn't give [him] a straight-forward answer." According to Deputy Leivas, C.S., and as captured by his body camera footage admitted into evidence, claimed to have walked from a family member's house where she was staying in Louise. In his efforts to search for a safe placement for K.H., C.S. refused to provide him with any information and denied his offer for transportation to her

4

family member's house. Deputy Leivas also attempted to contact other family members but was unsuccessful. C.S. eventually asked Deputy Leivas to take K.H. to the residence that she claimed to have walked from, which was a residence known to him as one where narcotics were used, and which he described as "a very unsafe placement."

Sheridan Reid testified that she is the assigned caseworker for K.H. According to Reid, the Department initially became involved with C.S. and K.H. due to K.H. testing positive for amphetamines at birth. Reid stated that the Department made contact with C.S. at the hospital, but she would not provide them with any information. She explained that C.S. and K.H. were no longer in contact with the Department, which resulted in K.H. being placed on CSCAL. Reid confirmed that K.H. was eventually located with C.S. after a report was made to law enforcement that she was witnessed walking with K.H. on a highway. She stated that K.H. was removed from C.S.'s care and placed with the Department, and the trial court thereafter issued court orders concerning C.S. and M.H. Reid stated that the Department's goal was to safely return K.H. to his family and to accomplish that goal, C.S. would have to demonstrate that she can provide a safe environment for K.H. According to Reid, she went over the family plan of service with C.S. and "she express[ed] interest" in completing services. Reid testified that C.S. had "inconsistent communication" during the pendency of this case because C.S. allegedly had a new phone and was using different phone numbers.

Reid further testified that C.S. did not have a stable living environment. She stated that C.S. had supervised visitation with K.H. in October of 2023, April of 2024, and November of 2024. The Department also moved the location for the visits closer to

5

C.S. because C.S. had transportation issues. Reid testified that C.S. did not complete parenting classes, a psychological evaluation, substance abuse counseling, or submit to random drug testing upon request. Reid explained that although C.S. did "some drug testing," it was not random, and she did not submit to those required by court order. For instance, C.S. was ordered by the court to submit to drug testing by a Friday, but did not arrive at the drug testing facility until the following Monday. Reid testified that C.S. showed up after "the Service Authorization . . . was expired" and Reid had to "stop what [she] was doing" to submit a new authorization form because "[she] was not expecting [C.S.] to go" due to the expiration of the deadline for the court-ordered testing. By the time Reid attempted to submit new authorization, "[C.S.] had already left." Reid admitted that it was "partially [her] fault because she didn't always send the [authorization form]" due to a lack of communication with C.S. Though C.S. did eventually submit to a drug test, Reid stated that she was not "happy" with the results of that drug test. The results were not offered into evidence.

Reid further stated that C.S. explained she was unable to begin services for about a month during the time she was in county jail for the child endangerment charge. According to Reid, C.S. "needed to take a couple of months to herself and . . . regroup [and] focus on herself" after her release from jail. Reid explained that although she sent service authorization forms to the service providers, the authorizations would expire if services were not initiated. According to Reid, C.S. started participating in substance abuse counseling, but the service authorization form expired. She stated that C.S. requested the Department reissue another authorization form so she could complete her substance abuse counseling at the "[e]nd of August [or] beginning of September" of

2024. Reid also stated that C.S. told her she was employed at a thrift store but was unable to provide proof of employment. Reid additionally testified that K.H. was placed with a relative at the time of trial and was "thriving," "walking," and "meeting all [of] his milestones." She stated that the caregivers "desire to adopt" K.H. Reid testified that the caregivers are able to provide K.H. with a stable home and provide for his basic needs, including medical attention. Reid elaborated that K.H. had "multiple ear infections" that could require him to get "tubes put in his ear[.]" She further testified that it would be in K.H.'s best interest to terminate the parent-child relationship with C.S. and M.H.

Christine Adame testified that she is C.S.'s relative and had been caring for K.H. for approximately eleven months by the time of trial. When K.H. first arrived in her care, he was "under[ ]weight" with a "double ear infection," and she sought medical treatment for him. Adame described K.H. as "happy and healthy" and attached to her and her husband. Adame stated that it is possible K.H. suffered from trauma because "[h]e was never properly attached to anybody." She further stated that her and her husband rearranged their work schedules so they could spend more time with K.H. When asked about her relationship with C.S., Adame admitted that she did not have a close relationship with her. C.S. informed Adame that she "d[id] not have to listen to [the Department]" and suggested she allow C.S. to visit K.H. without following the supervised visitation schedule. Adame testified that C.S. "threatened to come take" K.H. from her care. When asked if she would consider allowing C.S. a future supervised visit with the child, she stated she would be willing to do so if C.S. could maintain "clean drug tests," "counseling," and was "in a more healthy place." She further testified that she "would never deny [K.H.] the right to know his biological parents," and that she is "just

looking [out] for his emotional well[-]being through[out] his life." Adame stated that she is interested in adopting K.H. and had already completed multiple home studies as well as fifteen to twenty classes. She also testified that she was working with an adoption agency and wanted to give K.H. "a loving, stable home" where he "feel[s] safe."

M.H. testified that he has a history of drug abuse, has a criminal history, and has been to prison. M.H. testified that when he was arrested, he was residing with C.S. and "[f]or the most part" was "supporting her." M.H. was asked if he knew that C.S. "moved around a lot," to which he replied "I'm sure she probably did. She didn't have anybody but me." M.H. testified that when he left for prison, he "hoped that [C.S.] would have been all right" staying with his friends. M.H. admitted that during C.S.'s pregnancy, he was on probation and violated his conditions of community supervision so he could "get it over with." He further stated that at the time of trial, he had not used controlled substances for at least eighteen months. M.H. also stated he was on parole and required to submit to drug and alcohol testing.

C.S. testified that she had been in a relationship with M.H. for two and a half to three years before the child's birth. She admitted she was aware he was using controlled substances. Prior to K.H.'s birth, M.H. was arrested at least "twice" and she helped with his bond. M.H. also spent some time in rehab. According to C.S., "he did his best to" provide a stable living environment for her during her pregnancy. C.S. testified that she was aware he intentionally violated his community supervision. She also testified that there had been discussion about M.H. being present during the birth of the child, and it was difficult for her when M.H. was incarcerated. C.S. claimed that if M.H. had been present, "[she] would not have been out there on that road alone." She further

8

testified that the alleged child endangerment charge was still pending, and that since her release from jail "it[] [has] not been the easiest thing to get back on [her] feet." She admitted she was aware she needed to complete her family plan of service in order to have K.H. returned to her care. Regarding the scheduled visits with the Department, C.S. admitted she was uncooperative with the Department initially, and she would arrive at the visits but then "wouldn't go inside the building" to see K.H. C.S. stated that she had been unable to maintain contact with the Department due to having phone issues and that her phone number has changed "three or four times." She went on to explain that her phone "only connects on Wi-Fi" and "it's a hit or miss" if she gets connection, though she can also be reached by electronic communication. C.S was "staying with a friend" at the time of trial, whom she stated was a "good support system" for her. C.S. admitted that her living arrangements were expected "to be more short-term than long-term." When asked about her living arrangements in the future, C.S. replied that "[M.H.] and [herself] haven't been able to speak since . . . his release. . . . So, [she] made sure that [she] called [their] mutual friends and made sure [M.H.] had [her] phone number."

C.S. admitted she did not complete the psychological evaluation, substance abuse assessment, nor her parenting classes. She testified that she reached out about three weeks prior to trial to begin her parenting classes, but her authorization form had already expired approximately a week and a half before trial, though she stated she had completed the initial intake portion. She stated that she participated in "two or three sessions" of individual counseling while in county jail. C.S. further admitted that she was abusing "methamphetamines and illegal drugs . . . up until [she] found out [she] was pregnant" and that M.H. was aware of her substance abuse. She stated that Reid

9

reached out to her "[j]ust the one time" to drug test. C.S. further stated that she was employed part-time at the time of trial, and her "goal" was "[t]o be able to work full time." She stated that she would be willing to pay child support. C.S. testified she was "always the one consistently reaching out" to the Department and "just need[ed] a little bit more time" to complete her family plan of service. She testified that she recently visited with K.H. and was concerned that he had not seen her as often. She also expressed how much she loved K.H. and wanted him returned to her care.

At the conclusion of the bench trial, the trial court found by clear and convincing evidence that statutory grounds existed for terminating C.S.'s and M.H.'s parental rights and that termination was in K.H.'s best interest. *See id.* §§ 161.001(b)(1)(D), (E), (N), (O), 161.001(b)(2). The Department was appointed permanent managing conservator of K.H. This appeal followed.

## II.  STANDARD OF REVIEW

"[I]nvoluntary termination of parental rights involves fundamental constitutional rights" and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi—Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, "termination proceedings must be strictly scrutinized." *In re K.M.L.*, 443 S.W.3d at 112. In such cases, due process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 960, 769

(1981)). This intermediate standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. A parent's rights to their child may be terminated upon a showing by clear and convincing evidence that (1) he or she engaged in certain acts or omissions prescribed by statute, and (2) termination is in the child's best interest. *Id.* § 161.001(b).

When reviewing the legal sufficiency of the evidence, we "should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume "the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* Ultimately, we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible" while considering "undisputed facts that do not support the finding." *Id.* If we "determine[] that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then [we] must conclude that the evidence is legally insufficient." *Id.*

When reviewing the factual sufficiency of the evidence supporting termination, we ask "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In conducting this review, we consider whether "in light of

the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

Under the factual sufficiency standard, we defer to the trier of fact's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam); *see also In re C.H.*, 89 S.W.3d at 26 ("A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role."). "In a bench trial, the trial court acts as the fact-finder and is the sole judge of witness credibility." *In re A.M.*, 418 S.W.3d 830, 841 (Tex. App.—Dallas 2013, no pet.) (citing *Nguyen v. Nguyen*, 355 S.W.3d 82, 88 (Tex. App.—Houston [1st Dist.] 2011, pet. denied)). "The fact-finder may choose to believe one witness over another, and we may not impose our own opinion to the contrary." *Id.* (citing *Nguyen*, 355 S.W.3d at 88).

### III.   GROUNDS FOR TERMINATION

By her first issue, C.S. challenges the evidence as legally and factually insufficient to support the grounds for termination.

### A.   Applicable Law

While only one ground is necessary to support termination, when Subsections (D) and (E) (the "endangerment" grounds) are found, we must review those grounds as a matter of due process. *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022); *In re N.G.*, 577

12

S.W.3d 230, 237 (Tex. 2019) (per curiam) (holding that regardless of whether the termination judgment could be affirmed on another ground, due process requires that an appellate court detail its analysis for an appeal of termination of parental rights under Subsections (D) and (E)).

The endangerment grounds permit termination when a parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). The primary difference between Subsections (D) and (E) is that Subsection (D) focuses on the child's conditions or surroundings, while Subsection (E) focuses on the parent's or another's conduct whether by overt act or by omission. *In re A.L.H.*, 624 S.W.3d 47, 55–56 (Tex. App.—El Paso 2021, no pet.). However, the same evidence may support a finding under either subsection depending on the circumstances. *Id.* (providing the example of continued domestic violence in the home with the children as grounds under both Subsections (D) and (E)). "[E]ndangerment encompasses 'more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" *In re D.L.W.W.*, 617 S.W.3d 64, 78 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "'[E]ndanger' means to expose to loss or injury; to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Boyd*, 727 S.W.2d at 533).

Under Subsection (D), "we must examine the time before the [child]'s removal to determine whether the environment itself posed a danger to the [child]'s physical or

13

emotional well-being." *In re L.W.*, 609 S.W.3d 189, 199–200 (Tex. App.—Texarkana 2020, no pet.) (quoting *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). "A parent acts 'knowingly' when the parent is aware that the environment creates a potential danger to the child but the parent disregards that risk." *In re J.S.*, 675 S.W.3d 120, 128 (Tex. App.—Dallas 2023, no pet.).

Subsection (E) focuses on the parent's conduct rather than the child's conditions; it does not require merely a single act or omission, but instead requires a "voluntary, deliberate, and conscious course of conduct by the parent." *In re A.L.H.*, 624 S.W.3d at 56 (citing *In re K.A.C.*, 594 S.W.3d 364, 372 (Tex. App.—El Paso 2019, no pet.)). Under Subsection (E), we may consider evidence of the parent's conduct before the child's birth and after the child's removal. *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *5–7 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.) (considering parent's failure to complete drug treatment, failure to maintain a stable home and employment, failure to attend regularly scheduled visits, failure to emotionally and financially support the child, and repeated arrests as endangering to the child).

Drug use may also create a dangerous environment for the child. *In re J.S.*, 675 S.W.3d at 128; *In re L.W.*, 609 S.W.3d at 200.

> [I]llegal drug use alone may not be sufficient to show endangerment, [but] a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm. A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's "ability to parent."

*In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024) (quoting *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009)).

Accordingly, we will address the sufficiency of the evidence supporting the trial court's termination grounds under Subsections (D) and (E).

**B.     Analysis**

C.S. argues that the evidence adduced at trial was insufficient to support the trial court's finding because C.S. did not endanger the child. We disagree. Based on the record before us, and giving due deference to the trial court's findings, we conclude that the trial court could have formed a firm belief or conviction that C.S. knowingly allowed the child to remain in an endangering environment and that she engaged in endangering conduct. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E).

Endangering conduct may include the parent's actions occurring before the child's birth, including evidence of drug use and drug-related criminal activity. *In re J.O.A.*, 283 S.W.3d at 345; *see also In re J.F.*, No. 13-24-00136-CV, 2024 WL 3533075, at *8 (Tex. App.—Corpus Christi–Edinburg July 25, 2024, no pet.) (mem. op.). Here, C.S. admitted that she was struggling with illegal drug use before K.H.'s birth, namely methamphetamines. *See In re J.O.A.*, 283 S.W.3d at 345. She also admitted that M.H. was aware of her substance abuse, and that she was using illegal drugs "up until [she] found out [she] was pregnant." *See id.* C.S. and K.H. tested positive for amphetamines at K.H.'s birth. Because of the positive test at birth, the Department initiated contact with C.S. However, C.S. did not cooperate with the Department's investigation and K.H. was placed on CSCAL. According to Reid, C.S. never completed court-ordered random drug testing, which is considered a positive result under the family plan of service. *See In re*

15

*J.W.*, 645 S.W.3d at 734 ("Mother missed twelve of fourteen scheduled drug tests, resulting in those missed tests being deemed positive."). The trial court could have reasonably concluded that C.S.'s history of drug use constituted conduct that endangered her child's physical and emotional well-being irrespective of C.S.'s testimony that she was abusing methamphetamines and illegal drugs up until she found out she was pregnant, and of the evidence of "some drug testing." *See In re J.O.A.*, 283 S.W.3d at 346 ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."); *In re A.M.*, 495 S.W.3d 573, 579–80 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires outside the child's presence."). Thus, all of this evidence supports a finding that C.S. engaged in endangering conduct.

It is not necessary to have evidence that a parent "inflicted direct physical abuse on [the child]," because "evidence that [the parent] neglected [the child's] physical needs" shows that "neglect can be just as dangerous to the well-being of a child as direct physical abuse." *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (per curiam); *see also In re L.L.*, No. 13-24-00137-CV, 2024 WL 3448029, at *7 (Tex. App.—Corpus Christi–Edinburg July 18, 2024, no pet.) (mem. op.). Deputy Leivas initially made contact with C.S. and K.H. at a closed truck stop after reports that she was walking down State Highway 59 around midnight in dark clothing and carrying then eight-month-old K.H. He observed that K.H. was "dirty" wearing only "a T-shirt and a diaper." *See In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) (explaining that a child's uncleanliness constitutes "indicia which may prove endangerment"). C.S. did not

have any clothing or supplies for the child and was carrying only a cell phone and a pack of cigarettes. According to Deputy Leivas, C.S. had nothing "that could indicate that the [c]hild was being well taken care of at the time." When Deputy Leivas inquired where C.S. was headed when she was walking down the road, she refused to provide him with any information and denied his offer of transportation. Deputy Leivas also observed K.H. "continuously suck[ing] on his fingers as if he w[ere] trying to determine that he was hungry." Deputy Leivas could not get in contact with any family members willing to assist C.S and K.H. After C.S. was taken into custody, the only family member that she alleged could pick up and care for K.H. refused.

Further, "[t]he failure to provide appropriate medical care for a child is evidence a trial court may consider as conduct endangering the child." *In re R.S.-T.*, 522 S.W.3d 92, 113 (Tex. App.—San Antonio May 17, 2017, no pet.); *see also In re A.C.T.M.*, No. 13-23-00040-CV, 2024 WL 630876, at *14 (Tex. App.—Corpus Christi–Edinburg Feb. 15, 2024, no pet.) (mem. op.). Adame testified that K.H. had "multiple infections" and was scheduled to see a specialist as a result. The trial court heard evidence that K.H. had a "double-ear infection" when the child was placed in the Department's care, which could possibly have led to "tubes put in his ear" to prevent further infection. *See In re R.S.-T.*, 522 S.W.3d at 113; *see also In re L.L.*, 2024 WL 3448029, at *8 (holding parents allowed children to remain in an endangering environment where parents had not taken the children to the dentist resulting in the need for dental surgery). K.H. was not treated for these conditions until after he was placed in Adame's care. *See In re R.S.-T.*, 522 S.W.3d at 113. Taken together, all of this evidence suggests neglect of the child's physical needs and endangerment of the child. *See In re M.C.*, 917 S.W.2d at 270.

Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.). Additionally, the relationship of the parent and child, as well as efforts to improve or enhance parenting skills, are relevant in determining whether a parent's conduct is such that would "endanger" the child under § 161.001(b)(1). *In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied); *see also In re C.D.L.R.*, No. 13-19-00008-CV, 2019 WL 2608776, at *8 (Tex. App.—Corpus Christi–Edinburg June 26, 2019, no pet.) (mem. op.). In this case, C.S. refused to tell law enforcement where she was residing at the time of removal, stated that she did not have a permanent living situation at the time of trial, and did not testify as to any future plans for a permanent home. *See In re M.R.J.M.*, 280 S.W.3d at 503; *see also In re B.N.D.*, No. 04-21-00286-CV, 2021 WL 6127883, at *4–5 (Tex. App.—San Antonio Dec. 29, 2021, no pet.) (mem. op.) (citing *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.)) ("Mother's lack of stable housing and a consistent home environment exposed the children to a life of uncertainty and instability that endangers the children's physical and emotional well-being."). The home where she was previously staying with K.H. was known to law enforcement as being unsafe and whose occupants were known to use drugs. Deputy Leivas described the residence as a "very unsafe placement" for the child. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) ("[I]llegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being."). M.H. testified that he was mostly supporting C.S. before he was incarcerated and she "didn't

18

have anybody but [him]." C.S. confirmed he attempted to provide a "stable living environment for her during her pregnancy" until he went to prison. Further, Reid testified that one of the obstacles she faced with reaching C.S. was that she "didn't even know where she lived or where she was staying at," and that C.S. would infrequently visit the child. *See In re M.R.J.M.*, 280 S.W.3d at 503; *see also In re K.J.G.*, 2019 WL 3937278, at *5.

Considering the entire record, we conclude that the trial court could have formed a firm belief or conviction that C.S. both knowingly allowed her child to remain in conditions or surroundings which endangered his physical or emotional well-being, and engaged in conduct or knowingly placed her child with persons who engaged in conduct which endangered his physical or emotional well-being.[4] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E); *see In re R.R.A.*, 687 S.W.3d at 281 ("When a pattern of drug use is coupled with credible evidence of attendant risks to employment, housing, and prolonged absence from the children, a factfinder reasonably can find endangerment to the child's physical or emotional well-being under [Subsections] (D) and (E)."); *see also In re J.F.C.*, 96 S.W.3d at 266. We find that the evidence was legally and factually sufficient to support the trial court's termination finding by clear and convincing evidence. C.S.'s first issue is overruled.

---

[4] Because we conclude the evidence is factually and legally sufficient to support termination under Subsections (D) and (E), we do not need to review the sufficiency of the evidence under Subsections (N) and (O). *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."); *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022) (noting only one ground is necessary to uphold termination).

## IV.   BEST INTEREST OF THE CHILD

By her second issue, C.S. argues that termination is contrary to the child's best interest.

## A.   Applicable Law

The best-interest prong of the termination inquiry "is child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). The Supreme Court of Texas has identified several nonexclusive factors for courts to consider in determining the child's best interest, known as the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) the present and future emotional and physical danger to the child; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the child's best interest; (6) the plans for the child by those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is an improper one; and (9) any excuse for the parent's acts or omissions. *Id*. Evidence that is probative of grounds for termination may also be probative of the best interest of the child. *In re C.H.*, 89 S.W.3d at 28. Not all factors must weigh in favor of termination, "particularly if the evidence w[as] undisputed that the parental relationship endangered the safety of the child." *Id*. at 27. Further, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**B.      Analysis**

C.S. argues that there was no evidence offered at trial to support the finding that termination of her parental rights is in K.H.'s best interest. In support of her argument, C.S. asserts that there was no allegation that she did not have a strong love and desire to be in her child's life, that she is employed, and that she desires to financially support her child. We consider the *Holley* factors as outlined above.

First, we address the child's desires. The record contains no evidence regarding K.H.'s desires, as he is too young to express wishes, and there is not a sufficient proxy by which we could gauge his desires. *See In re A.J.D.-J.*, 667 S.W.3d 813, 833 (Tex. App.—Houston [1st Dist.] 2023, no pet.) ("[T]he general rule is that when a child is too young to express [them]self, [their] desires are neutral as to the trial court's best-interest finding, unless there is circumstantial evidence from which the factfinder could infer [their] desires by proxy."). When children are too young to appropriately express their desires, a court may consider the quality and extent of the children's relationship with the prospective placements. *See In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.) (considering evidence that children were bonded to foster family, were happy in foster home, and enjoyed visitation with father in assessing young children's desires); *see also In re R.E.S. III*, No. 13-10-00132-CV, 2011 WL 2475926, at *3 (Tex. App.—Corpus Christi–Edinburg June 23, 2011, no pet.) (mem. op.) (considering evidence that mother did not visit children for over three years). Evidence that a child has spent minimal time in the presence of the child's parent is relevant to the best-interest determination and specifically relevant to the child's desires. *See In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (citing *In re R.A.G.*,

545 S.W.3d 645, 653 (Tex. App.—El Paso 2017, no pet.)); *see also In re E.L.H.*, No. 13-22-00192-CV, 2022 WL 3652497, at *4 (Tex. App.—Corpus Christi–Edinburg Aug. 25, 2022, no pet.) (mem. op.). Thus, the trial court could have taken into account the evidence of K.H.'s relationship with Adame and her husband, the quality and extent of that relationship, and the fact that C.S. infrequently visited K.H. while he was in the Department's care. This factor weighs in favor of the best-interest finding.

Next, we consider the child's present and future physical and emotional needs and present and future physical and emotional danger. The record does not contain any evidence of any special or exceptional emotional or physical needs of the child. There was, however, evidence of emotional and physical danger to the child. *See In re C.H.*, 89 S.W.3d at 28; *see also In re G.S.*, No. 14-14-00477-CV, 2014 WL 4699480, at *12 (Tex. App.—Houston [14th Dist.] Sept. 23, 2014, no pet.) (mem. op.) ("The unchallenged predicate findings under [§ 161.001(b)(1)(E)], endangering conduct, are binding and may be considered as evidence related to the court's best interest finding."). K.H. was removed after C.S. was arrested for child endangerment. When Deputy Leivas arrived on scene, she was found without food or supplies for the child and initially refused assistance or transportation. K.H. appeared dirty and was wearing a diaper and a T-shirt. C.S. was staying at a home known to be occupied by drug users. Additionally, C.S. admitted to using amphetamines and methamphetamines. *See In re J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."). Lastly, K.H. tested positive at birth for amphetamines, which marked the beginning of the Department's involvement with the child. Accordingly, the evidence as to the child's present and future emotional and

22

physical needs and emotional and physical danger to the child supports the best-interest finding.

We next consider the ability of the individuals seeking custody of the child, the programs available to assist the individuals in promoting the child's best interest, the stability of the proposed placements, and future plans for the child together. A child's need for certainty and permanence, including the establishment of a stable, permanent home, is the paramount consideration in a best-interest decision. *In re J.G.S.*, 574 S.W.3d 101, 126 (Tex. App.—Houston [1st Dist.] 2019, pet. denied); *see also In re A.B.*, No. 13-19-00539-CV, 2020 WL 948370, at *11 (Tex. App.—Corpus Christi–Edinburg Feb. 27, 2020, pet. denied) (mem. op.). Reid testified about K.H.'s placement with Adame and stated that K.H. was "thriving" and "meeting all his milestones." Adame testified that K.H. had been in her care for almost eleven months, that he was "never properly attached to anybody," and that "now [he] has that attachment style with both [Adame] and [her] husband[.]" Adame also stated that K.H. is "becoming a normal little boy," "learning to talk," and is "happy and healthy." Reid testified that C.S. would not visit or attempt to contact the Department to schedule visits with K.H. C.S. admitted that "there was a period of time where the visits weren't happening," and that she was "not very cooperative in the beginning."

Further, Adame indicated a willingness to adopt K.H. Adame testified that she is working with an adoption agency and that she "want[s] to give [K.H.] a loving, stable home." Regarding her efforts toward adoption, Adame confirmed that she had taken fifteen to twenty classes and completed multiple home studies. She further stated that K.H. is always with either herself or her husband; she works nights four times a week,

and her husband "changed his job during this transition so he could be home Monday through Friday." Adame also detailed K.H.'s usual daily schedule, elaborating on his naptime, socialization with other children, and support from family members and friends. Though the record did not reflect any specific or exceptional physical or emotional needs of the child, Reid testified that Adame was "taking care of him medically[,] emotionally, [and] physically." To the contrary, C.S. did not have long-term living arrangements and stated she was staying with a friend, which was expected to be "more short-term than long-term." She also testified that she did not have a full-time job. Thus, the trial court could have considered the parenting ability of the individuals seeking custody, the programs available to assist them, and the stability of the home and proposed placement in favor of the best-interest finding.

C.S. failed to attend visits with her child despite the Department moving the location of the supervised visits closer to her. *See Holley*, 544 S.W.2d at 371–72; *see also In re A.V.G.-P. & A.O.G.-P.*, No. 10-23-00294-CV, 2024 WL 1327908, at *4 (Tex. App.—Waco Mar. 28, 2024, no pet.) (mem. op.) ("[A] parent's failure to regularly visit his children after removal may support a finding that termination of the parent's rights is in the children's best interest."). C.S. waited until three weeks prior to trial to sign up for parenting classes, and she otherwise completely failed to engage and complete the services provided to her through the Department. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (holding that parent's failure to complete court-ordered services can support a best-interest finding). Furthermore, C.S. did not demonstrate that she could provide her child a stable living environment and did not communicate with the

Department throughout these proceedings. Considering the totality of the evidence, these factors weigh in favor of the best-interest finding.

Finally, we consider the parent's acts or omissions that may indicate the existing parent-child relationship is an improper one and any excuse to the parent's acts or omissions. K.H. was removed from C.S.'s care after she was arrested for child endangerment and because of her history of substance abuse. Although C.S. testified that she had not recently used drugs, the trial court was able to infer that she continued some drug use by her failure to randomly drug test. *See id.*; *In re M.R.*, 243 S.W.3d at 818. When asked about her inconsistent communication with the Department to facilitate visits with her child and submit to drug testing, she faulted her phone only being able to connect to Wi-Fi. C.S. also admitted she was uncooperative with the Department initially, and she would arrive at the visits but then "wouldn't go inside the building" to see her child. As to her failure to complete court-ordered services, C.S. contends in her brief that it was "not her fault" but rather due to her phone and transportation issues. The trial court was free to weigh the credibility of her explanation against the Department's evidence that they attempted to accommodate C.S., as well as the evidence demonstrating that C.S. simply failed to initiate and complete services. These factors weigh in favor of the best-interest finding.

Having reviewed the entirety of the record, we conclude that the evidence was legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship was in the best interest of K.H. C.S.'s second issue is overruled. *See In re G.M.*, 596 S.W.2d at 847; *In re L.J.N.*, 329 S.W.3d at 671.

## V.     Conclusion

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Delivered and filed on the
13th day of March, 2025.